RECORD NO. 13-3

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

---

### ERROL DUKE MOSES,

*Petitioner-Appellant,*

v.

### KENNETH E. LASSITER, Warden,
### Central Prison, Raleigh, North Carolina,

*Respondent-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA, AT GREENSBORO
THE HONORABLE THOMAS D. SCHROEDER, PRESIDING

---

### OPENING BRIEF OF APPELLANT

---

Kenneth J. Rose
Center for Death Penalty Litigation
201 West Main Street, Suite 301
Durham, North Carolina 27701
(919) 956-9545 Tel.
Ken@cdpl.org

Shelagh Rebecca Kenney
Center for Death Penalty Litigation
201 West Main Street, Suite 301
Durham, North Carolina 27701
(919) 956-9545 Tel.
Shelagh@cdpl.org

*Counsel for Petitioner-Appellant*                    April 3, 2013

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ........................................................... iii

INTRODUCTION ........................................................................1

STATEMENT OF JURISDICTION...........................................3

ISSUE PRESENTED FOR REVIEW .....................................4

I. THIS COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE THE DISTRICT COURT ERRED BY CHARACTERIZING PETITIONER'S RULE 60 MOTION AS A SUCCESSIVE HABEAS CORPUS PETITION AND BY HOLDING THAT FRAUD ON THE STATE COURT IN POST-CONVICTION LITIGATION DOES NOT CONSTITUTE FRAUD ON THE COURT FOR PURPOSES OF RULE 60 ....................................................4

STATEMENT OF THE CASE...................................................4

 Procedural History...................................................................4

STATEMENT OF FACTS .........................................................6

 Pre-Trial Preparation: The State and McCree Make a Deal ...........6

 Trial Proceedings: State Actors and McCree Lie about Deal .........11

 Post-Trial Developments: State Follows Through on Deal with McCree .......17

 State Post-Conviction Proceedings
 First Motion for Appropriate Relief: State Hides Evidence of Deal ...............17

 Third Motion for Appropriate Relief & March 2010 State Court Evidentiary Hearing: Deal with McCree Exposed ...........................19

SUMMARY OF ARGUMENT ................................................25

ARGUMENT .............................................................................25

i

Request for Certificate of Appealability and Standard of Review ..........................25

Discussion of Issue............................................................................................27

CONCLUSION ...................................................................................................34

REQUEST FOR ORAL ARGUMENT ..................................................................34

CERTIFICATE OF COMPLIANCE......................................................................35

CERTIFICATE OF SERVICE .............................................................................36

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Banks v. Dretke*,
    540 U.S. 668 (2004)..........................................................................29, 30, 31

*Barefoot v. Estelle*,
    463 U.S. 880 (1983)........................................................................26

*Fuller v. Johnson*,
    114 F.3d 491 (5th Cir. 1997) .........................................................26

*In re Genesys*,
    204 F.3d 124 (4th Cir. 2000) ....................................................31, 33

*Giglio v. United States*,
    405 U.S. 150 (1972)...................................................................30, 31

*In re Golf 255, Inc.*,
    652 F.3d 806 (7th Cir. 2011) .........................................................32

*Gonzalez v. Crosby*,
    545 U.S. 524 (2005)..........................................................27, 28, 29, 33

*Great Coastal Express, Inc. v. International Board of Teamsters*,
    675 F.2d 1349 (4th Cir. 1982) ....................................................27, 31

*Miller-El v. Cockrell*,
    537 U.S. 322 (2003)........................................................................26

*Moses v. Branker*,
    554 U.S. 924 (2008)..........................................................................5

*Moses v. Branker*,
    2007 WL 3083548 (4th Cir. Oct. 23, 2007) ....................................5

*Moses v. North Carolina*,
    528 U.S. 1124 (2000).........................................................................4

*Napue v. Illinois*,
   360 U.S. 264 (1959) ........................................................................30

*Porter v. Gramley*,
   112 F.3d 1308 (7th Cir. 1997) ......................................................27

*Rose v. Lee*,
   252 F.3d 676 (4th Cir. 2001) ........................................................26

*Slack v. McDaniel*,
   529 U.S. 473 (2000) ......................................................................26

*Wade v. Robinson*,
   327 F.3d 328 (4th Cir. 2003) ........................................................26

*Workman v. Bell*,
   484 F.3d 837 (6th Cir. 2007) ........................................................32

## STATE CASES

*State v. Moses*,
   350 N.C. 741, 517 S.E.2d 853 (1999) ............................................4

*State v. Moses*,
   356 N.C. 442, 573 S.E.2d 160 (2002) ............................................5

*State v. Moses*,
   __ N.C. __, 706 S.E.2d 246 (2011) ...............................................5

## STATUTES

28 U.S.C. §1291 ....................................................................................3

28 U.S.C. §2253 ....................................................................................3

28 U.S.C. §2253(c) ..............................................................................25

28 U.S.C. §2253(c)(2) ..........................................................................25

iv

28 U.S.C. §2254 .................................................................................3, 29

N.C. Gen. Stat. §15A-2000(e)(11) ...........................................................16

## RULES

Fed. R. Civ. P. 60(b) ................................................................*passim*

Fed. R. Civ. P. 60(b)(6) .............................................................5, 27, 28, 33

Fed. R. Civ. P. 60(d) .................................................................5, 27, 28, 33

Fed. R. Civ. P. 60(d)(3) ..............................................................................5

## INTRODUCTION

The State's key evidence against Moses for the killings of Jacinto Dunkley and Ricky Griffin came from a codefendant-turned-snitch named Casey McCree. At trial and in post-conviction proceedings, the State argued there was no promise of leniency by lead prosecutor Assistant District Attorney Vincent Rabil to McCree. Even considering the State's version of the facts, it defies reality to suggest there was no promise of leniency in exchange for McCree's testimony.

- First, McCree was the key witness for the State. According to McCree, he was the sole eyewitness to the killing of Dunkley and Moses confessed to him that he shot Griffin.

- Second, McCree confessed and testified at Moses's trial in a manner that was incriminatory and provided the State evidence sufficient to convict McCree of murder and other serious felonies.

- Third, McCree initiated discussions with law enforcement officers and separately with lead prosecutor Rabil about whether he would be granted immunity from prosecution in return for favorable testimony.

- Fourth, prior to trial, McCree asked Rabil for immunity in exchange for his testimony at Moses's trial, to which Rabil responded that he would have to "trust us."

- Fifth, following Moses's trial and after McCree had testified, there were no subsequent conversations between McCree and any prosecutor or law enforcement officer about whether he would be charged with any crime related to the Dunkley or Griffin murders.

- Sixth, despite his self-incriminating testimony, McCree has never been charged with any crime related to the Dunkley or Griffin murders.

At the closing argument at Moses's capital trial, Rabil argued forcefully and effectively to the jury that there was no promise of leniency to the State's key witness, Casey McCree. He argued: "There is absolutely no evidence of any deal with Casey McCree, ladies and gentlemen.  None.  That is pure speculation. There is no evidence of that." JA 54-55.

For over thirteen years, Moses was unable to uncover any evidence to the contrary. At every turn when the issue was raised, the State denied the existence of a promise of leniency to Casey McCree. In pretrial proceedings, the State assured defense counsel there was no promise. At trial, the State avowed, through the

2

testimony of McCree and law enforcement officers and through Rabil's argument, that there was no promise. In the first state post-conviction proceeding, the State presented affidavits from Rabil and two law enforcement officers stating there was no promise of leniency. It was not until 2009, twelve years after Errol Moses was sentenced to die that a state actor finally admitted what Petitioner suspected all along: lead prosecutor Rabil had in fact lied to the jury and had promised Casey McCree leniency in return for his testimony against Errol Moses. In two sworn affidavits and at an evidentiary hearing in 2010, Rabil admitted to the existence of the previously undisclosed "trust me" deal.

## STATEMENT OF JURISDICTION

This is an appeal by North Carolina death row prisoner, Errol Duke Moses. The district court had jurisdiction over this matter pursuant to 28 U.S.C. §2254. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §§1291 and 2253. The district court entered judgment on December 21, 2012.  Moses gave timely notice of appeal on January 17, 2013.

<u>**ISSUE PRESENTED FOR REVIEW**</u>

I.     **THIS COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE THE DISTRICT COURT ERRED BY CHARACTERIZING PETITIONER'S RULE 60 MOTION AS A SUCCESSIVE HABEAS CORPUS PETITION AND BY HOLDING THAT FRAUD ON THE STATE COURT IN POST-CONVICTION LITIGATION DOES NOT CONSTITUTE FRAUD ON THE COURT FOR PURPOSES OF RULE 60.**

<u>**STATEMENT OF THE CASE**</u>

<u>**Procedural History**</u>

Petitioner was indicted for the first-degree murders of Ricky Nelson Griffin and Jacinto E. Dunkley. At his capital trial, Moses was convicted of two counts of first-degree murder. Following a capital sentencing proceeding, the jury recommended sentences of death for both first-degree murder convictions and the trial court entered judgment accordingly on November 18, 1997.

The North Carolina Supreme Court affirmed Petitioner's murder convictions and sentences of death. *State v. Moses*, 350 N.C. 741, 517 S.E.2d 853 (1999). The United States Supreme Court denied the petition for writ of *certiorari*. *Moses v. North Carolina*, 528 U.S. 1124 (2000).

Petitioner filed a Motion for Appropriate Relief in the Superior Court of Forsyth County on September 15, 2000. Petitioner filed an amendment to his Motion for Appropriate Relief. The MAR was denied in orders dated August 17, 2001 and September 6, 2001. The North Carolina Supreme Court denied the

4

petition. *State v. Moses*, 356 N.C. 442, 573 S.E.2d 160 (2002).

Petitioner filed a petition for writ of habeas corpus in the United States District Court for the Middle District of North Carolina, which was denied. JA 61-107.

This Court affirmed the denial of the petition for writ of habeas corpus, and denied rehearing. *Moses v. Branker*, 2007 WL 3083548 (4th Cir. Oct. 23, 2007) (unpublished). The United States Supreme Court denied the petition. *Moses v. Branker*, 554 U.S. 924 (2008).

Petitioner filed a third Motion for Appropriate Relief in the Superior Court of Forsyth County on October 1, 2009, concerning the existence of a deal with the State's key witness Casey McCree. JA 132-151. The Superior Court conducted an evidentiary hearing on March 18, 2010, and following briefing of the issues, entered an order denying relief on July 9, 2010. JA 152-193. The North Carolina Supreme Court denied review by certiorari on March 11, 2011. *State v. Moses*, __ N.C. __, 706 S.E.2d 246 (2011).

On September 23, 2011, Petitioner filed a motion for relief from judgment, pursuant to Fed. R. Civ. P. 60(b)(6), or, in the alternative, Rule 60(d)(3). JA 108-131. On July 17, 2012, United States Magistrate Judge L. Patrick Auld issued recommendations concluding that the motion did not come within the reach of Federal Rule of Civil Procedure 60(b) or (d), but recommended that the motion be

construed as a Successive Petition for Writ of Habeas Corpus and that the Motion be transferred to this Court for a determination of the propriety of pre-filing authorization.  JA 492-513. On December 21, 2012, United States District Court Judge Thomas D. Schroeder issued an order adopting the Magistrate Judge's Recommendations. JA 514-515. Petitioner filed a timely notice of appeal on January 17, 2013.  JA 516.

This matter was transferred to this Court on December 21, 2012, for a determination of pre-filing authorization in the district court. That motion was denied on February 7, 2013.

## STATEMENT OF FACTS

Moses has unwaveringly maintained his innocence of the killings of Griffin and Dunkley. As to the Dunkley homicide, Moses has consistently stated that McCree wanted to rob Dunkley and that McCree shot and killed Dunkley. JA 322-330. There was no physical evidence to link Moses to either homicide. The only direct evidence that Moses committed either murder came from the testimony of McCree, who, by his own admission, was involved in the Dunkley shooting.

### Pre-Trial Preparation: The State and McCree Make a Deal

On three or more occasions prior to Moses's trial in 1997, prosecutors and law enforcement officials discussed the possibility of a deal with their key witness, Casey McCree. Twice, Detective Mike Barker and McCree discussed

6

immunity. The third and last discussion occurred shortly before trial and involved McCree and Assistant District Attorney Rabil.

The possibility of a deal was first discussed between Barker and McCree on March 22, 1996, during the first interview in which McCree claimed he witnessed the murder of Jacinto Dunkley. Before this interview, McCree had denied any knowledge of or involvement in the murder. In the March 22, 1996 unrecorded interview, McCree gave a self-serving version of the crime, in which he exculpated himself and placed the entire blame for the Dunkley murder on Errol Moses. JA 332-346. In this interview with McCree, Barker raised the possibility that McCree might secure immunity for his involvement in the Dunkley homicide by testifying against Moses. Barker told McCree that the prosecution, and not law enforcement, would decide whether to prosecute McCree:

> Mr. McCree said he would be willing to testify in court about his actions on the night of 01-27-96 and his observations involving the suspect, "Craig" (Errol Moses). *The writer informed Mr. McCree that the District Attorney's Office would have the final say as to who was charged in this incident.*

JA 346 (emphasis added).

Subsequent to the first March 22, 1996 interview, law enforcement officers conducted additional interviews with McCree. These interviews were recorded on March 22, March 26, April 3, and April 15, 1996. During these interviews,

McCree continued to blame Moses for the killing of Dunkley, but McCree also implicated himself in the robbery and murder. No deal with McCree was discussed in the recordings of these four interviews. Nothing in these recorded statements indicates that law enforcement officers ever broached the subject of charging McCree for his involvement in the Dunkley murder. JA 348-409.

The issue of a deal arose a second time approximately one month prior to Moses's trial in November 1997. In a sworn affidavit from Detective Barker submitted by the State in 2001, Barker recounted how McCree asked for immunity:

> Casey McCree may have asked me about whether he could get "immunity" prior to testifying at trial. I told him I would call the District Attorney's Office. . . . I spoke to Vincent Rabil, the Assistant District Attorney who was working on the case with me. Assistant District Attorney Rabil told me that because Casey McCree had already cooperated and made several statements to investigators concerning these cases that the State was not going to grant McCree immunity. I conveyed this information to McCree.[1]

JA 411. Many years later, Rabil confirmed this account in his January 29, 2001 affidavit and in his testimony at the March 18, 2010 evidentiary hearing. JA 413;

---

[1] Barker also stated in his January 29, 2001 affidavit that "[McCree] never brought the topic [of immunity] up again." JA 411. There is no evidence that Barker and McCree discussed immunity again with each other. However, all of the evidence indicates that McCree asked Rabil for a letter of immunity after this interaction with Barker. JA 240, 308.

JA 242-43, 246-48, 258, 264. Rabil also told Barker that if "McCree had a problem with not being granted immunity to let him know."  JA 243, 246.

The topic of a deal came up a third time shortly before trial. Rabil met with McCree to prepare him for his testimony at Moses's trial. This meeting took place within one month of the November 1997 trial. At the suggestion of a relative, McCree requested that Rabil give him a letter of immunity for his testimony.  JA 240, 247. Rabil testified that McCree asked him "why didn't you give me the letter of immunity that I previously asked for."  JA 240. Rabil responded he would not give McCree a letter of immunity because McCree had already provided statements to police. JA 240, 246. Rabil asked McCree if he had anything to change about what he had told the prosecution.  JA 241, 265. McCree said he did not. JA 241. Rabil then asked if he was willing to testify without a letter of immunity.  JA 241. According to Rabil, when McCree responded in the affirmative, Rabil told McCree "you will just have to trust us."   JA 260. *See also* JA 241, 261. Both McCree and Rabil specifically recall that Rabil told McCree that McCree would have to "trust him" if he testified. *See also* JA 308 (McCree's testimony that Rabil told him, "you're just going to have to trust me"); JA 171 (finding that McCree asked Rabil for immunity in exchange for his testimony at Moses's trial, to which Rabil responded that he would have to "trust us").

9

Defense counsel made every effort to uncover any deals made by the State with McCree, making a specific request in a motion for discovery for evidence related to any deals with McCree. *See* JA 419-21 (requesting "[a]ny inducements, rewards or 'deals' made in exchange for testimony, specifically any inducements to Casey McCree . . . by any district attorney, police officer or any other law enforcement representative"). At the time of trial, defense counsel Clark Fischer believed the State had fully complied with all requested discovery. *See* JA 425-26 ("I spoke repeatedly with the detectives and the District Attorney prosecuting Mr. Moses. I had no evidence that the State had entered into any deal or agreement with Casey McCree in exchange for his testimony . . . .").

Rabil testified at the March 2010 evidentiary hearing that he did not make a formal, written arrangement with McCree because a formal deal would create a problem with McCree's credibility when he testified:

> I knew if there was a deal, an agreement that he would not be charged in exchange for his testimony, then I would have to disclose that. *I was trying to be careful not to make a deal because I didn't want to have to create a problem with his credibility that he was saying all this stuff so he wouldn't be prosecuted.* I wanted him to testify knowing that, you know, he was incriminating himself and that he might be charged if someone ever wanted to do that.

JA 265 (emphasis added).

10

**Trial Proceedings: State Actors and McCree Lie about Deal**

At Moses's trial, McCree implicated Moses in both the Jacinto Dunkley and Ricky Griffin murders.  JA 215-17.  McCree testified that he drove with Moses to Dunkley's house in a vehicle stolen from a rental car agency.  JA 18.  On the way to Dunkley's house, McCree claimed that Moses told him, "I'm about to do something and if another person is there you're going to have to go ahead and do her too."  JA 19.  McCree then reached under the car seat and put a .380 pistol in his pocket.  JA 20.  McCree entered Dunkley's house first and Moses followed. JA 22-24. McCree testified that Moses shot Dunkley twice. JA 24-26. McCree admitted taking a .380 pistol into Dunkley's home during the murder and stealing Dunkley's car after the murder. JA 20, 34-35.

McCree's testimony was also the linchpin of the State's proof that Moses killed Ricky Griffin. According to McCree, Moses made statements hinting that he killed Griffin:

> Moses was standing there and he said I wonder who did this, too, you know, and he was saying, you know, whoever did it had to be smart, you know, cause they didn't get caught, they didn't leave no trace.

JA 36. McCree testified that, on another occasion, he asked Moses whether he knew who had killed Griffin. According to McCree, Moses acknowledged killing Griffin, and looked at him and smiled. JA 38-39, 45.

11

On cross-examination, defense counsel sought to discredit McCree. McCree initially denied he had ever lied to police investigators regarding the Griffin or Dunkley cases, but he eventually admitted that when first interviewed, he did not say anything about being at Dunkley's house or seeing Dunkley get shot. JA 41-43. McCree also acknowledged that at first he did not tell detectives he had taken Dunkley's car after the shooting. JA 43. He admitted that when he told Barker that he did not know anything about the Dunkley murder, he was not telling the truth. JA 44.

The State relied heavily on McCree's testimony during its closing argument to the jury. Rabil argued that the State's case rested on McCree:

> The State has the burden of proof, ladies and gentlemen. We have to prove beyond a reasonable doubt the identity of the killer in both cases and we have to show a jury what happened. We have to have a witness. Casey McCree is the witness.

JA 56.

Despite the critical nature of McCree's testimony, the State never revealed the "trust me" deal. Rabil elicited from McCree sworn testimony that he had no deal with prosecutors:

> Q.   Now Casey, you have not been charged with anything in connection with this case, is that correct?
>
> A.   That's correct.

12

> Q.   And have you been offered immunity by the State?
>
> A.   No, sir.

JA 40.

During cross-examination, McCree repeated his story that he had no deal

with the State:

> Q.   And isn't it true, sir, that in the course of your dealings with the police and the D.A.'s office, y'all have entered into a deal in this case, haven't you?
>
> A.   No.  We haven't.
>
> Q.   So you deny that there's any arrangement regarding your testimony in this case?
>
> A.   Me and the D.A. and all of them over there have never sat down and agreed to anything.  They asked for my testimony.  I give it to them, and I gave them the truth. They never told me anything about you tell us this, we'll get you off on this. No.

JA 46-47.

Rabil then elicited the following testimony from Detective Barker in an

effort to show the jury that McCree testified without the promise of any deal or

inducement:

> Q.   Okay.  And when you talked to Mr. McCree about whether or not he was going to be charged, what

did you tell him?  Did you ever tell him he was not going to be charged?

A.    No.  I did not.

Q.    So to your knowledge it was left with Mr. McCree that he could be charged?  Is that correct?

A.    That's correct.

Q.    *And he knew that when he made all these statements to you?*

…

Q.    *At the time Mr. McCree gave you the statements that he did on tape that you testified here today, have you promised him anything?*

A.    No sir.

Q.    Have you promised that anything would happen to him?

A.    No sir.

Q.    Have you promised him anything?

A.    No sir.

Q.    *To your knowledge has the district attorney's office ever promised Mr. McCree anything?*

A.    *No sir.*

MR. RABIL:  That's all.

14

JA 50-51 (emphasis added). Clark Fischer repeatedly attempted to elicit information regarding any deals with McCree on cross-examination without success. JA 48-49.

During closing argument, Rabil flatly denied the existence of a deal with Casey McCree:

> You are the sole judges of the truth and the facts in the case and you decide what to believe of any witness's testimony. You can believe some, part of it, all of it, none of what they say, but you all agreed that you would not automatically throw out everything a witness says just because of their past or their criminal record. *Mr. Fischer is going to stand up here and Mr. Clary and they are going to say that Casey was an accomplice at the Dunkley homicide and he hasn't been charged - - there must be a deal, a secret deal or something. There is absolutely no evidence of any deal with Casey McCree, ladies and gentlemen. None. That is pure speculation. There is no evidence of that.*

JA 54-55 (emphasis added). Rabil maintained that McCree testified not because he was worried about whether he would be charged, but purely in the interest of justice. Rabil argued, "That's what Casey said is the reason he's testifying [is] to see that justice is done." JA 57. In light of the State's continued denial of any deal with McCree in exchange for his testimony, trial counsel Fischer conceded in his closing argument, "Mr. Rabil went on and on about the fact that there is no deal, there's no evidence of a deal, and you know he's right. There's no plea bargain floating around out there . . . ." JA 60.

15

The State recognized that McCree's credibility was critical. Rabil argued to the jury that, despite McCree's testimony that suggested otherwise, McCree "was consistent in practically everything else he told the police and testified to." JA 58. The State maintained that, while McCree hid the truth at the beginning or may have lied to the police about details or embarrassing things, he got the big things right. The prosecutor further argued that while McCree initially may have withheld details from the police, he told the jury "everything." JA 58.

The jury convicted Moses of first-degree murder in both the Dunkley and Griffin homicides. At the sentencing phase, the State offered the course of conduct statutory aggravating factor, N.C. Gen. Stat. §15A-2000(e)(11),[2] as the only aggravating factor present in both murders. Upon deliberating, the jury found the existence of the course of conduct aggravating factor and sentenced Moses to death. For each murder, the other murder supported the course of conduct aggravating factor.

At no time before Moses was convicted and sentenced to death for the Griffin and Dunkley murders did the State reveal to the defense its "trust me" deal with McCree. JA 247-48.

---

[2] N.C. Gen. Stat. §15A-2000(e)(11) provides: The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons.

**Post-Trial Developments: State Follows Through on Deal with McCree**

It was the province of the State to determine whether McCree should be charged for his involvement in the Dunkley homicide and other crimes. JA 208-09. Rabil could have charged McCree with felony murder based on McCree's statements. JA 253. After McCree cooperated with law enforcement officials by providing statements against Moses, prosecutors chose not to prosecute McCree. Despite implicating himself, McCree has never been charged with any crime in connection to the Dunkley murder. JA 307.

Indeed, after Moses's trial, law enforcement and prosecutors never even discussed whether McCree would be charged with the murder and robbery of Jacinto Dunkley or with the other crimes to which he had admitted in his testimony. JA 248-50, 253, 257-58, 293. McCree, in turn, never asked. JA 248-49, 293. It is clear prosecutors had no intention to charge McCree with any crime related to the murder and robbery of Dunkley as long as he cooperated. JA 250.

**State Post-Conviction Proceedings**
**First Motion for Appropriate Relief: State Hides Evidence of Deal**

In his first Motion for Appropriate Relief, Petitioner alleged (1) the State created the false impression that "they reserved the right to prosecute Casey McCree notwithstanding his testimony in the Dunkley homicide," and (2) trial counsel "failed to adequately cross-examine Casey McCree, Detective Mike

Barker and Detective Mike Rowe concerning the nature and extent of any discussions or inducements that were made to Mr. McCree by the Winston-Salem Police Department, the District Attorney's Office or other governmental agency." *See* JA 427-36.

In responding to the MAR, the State presented affidavits from Rowe, Barker, Rabil, and McCree. *See* JA 410-17. Detectives Rowe and Barker denied any knowledge of a deal with McCree. Rabil denied McCree was promised anything in return for statements to police, and stated that McCree "never asked me for immunity or any deal for any inducements prior to making any statements to the Winston-Salem Police Department concerning the Dunkley and Griffin homicide."[3] JA 413. McCree also denied the existence of any deals or promises of leniency from law enforcement officers or the prosecutors. JA 415.

The State also attempted to obscure the existence of a deal by presenting an affidavit from trial counsel stating that counsel diligently, but unsuccessfully, sought to discover any deals before trial:

> I spoke repeatedly with the detectives and the District Attorney prosecuting Mr. Moses. I had no evidence that

---

[3] This statement by Rabil in his 2001 affidavit illustrates his continued effort to hide the "trust me" deal with McCree. In the 2001 affidavit, Rabil is careful to point out that McCree never asked for a deal "prior to making any statements to the Winston-Salem Police Department." Rabil conspicuously does not state in this 2001 affidavit whether McCree asked for a deal *after* making his statements, which is what actually occurred.

> the state had entered into any deal or agreement with
> Casey McCree in exchange for his testimony. . . . Mr.
> McCree and Detectives Barker and Rowe were not
> going to "crack" and admit that a deal or agreement with
> Mr. McCree for his testimony existed.

JA 425-26.

Unsurprisingly, in denying Moses's claims, the state post-conviction court found no evidence in the record of any "agreement," "understanding," or "deal." JA 439-40. The state court could not have concluded differently as Rabil and McCree had repeatedly denied to the trial court, counsel, and the jury that there was a deal.

## Third Motion for Appropriate Relief[4] & March 2010 State Court Evidentiary Hearing: Deal with McCree Exposed

During a face-to-face meeting with undersigned counsel on April 30, 2009, Rabil for the first time disclosed that he had told Casey McCree prior to trial that McCree would have to trust him that he would not be prosecuted if he testified. JA 442. Following this disclosure, post-conviction counsel provided Rabil a written summary of their notes of the April 2009 meeting. JA 444. While Rabil made some changes to the notes, he made no corrections to his declaration that he had told McCree to trust him that he would not be prosecuted if he testified. JA 224;

---

[4] On August 11, 2005, Defendant filed a Second Motion for Appropriate Relief, which raised claims unrelated to the matter at issue in this appeal.

JA 446-62. On July 7, 2009, Rabil signed a sworn affidavit, acknowledging his "trust me" deal with McCree. JA 464-65.

On September 28, 2009, defense counsel provided Rabil with a draft of Defendant's Third MAR, which referred to Rabil's July 2009 affidavit. The draft MAR also referred to the January 2001 affidavit Rabil had provided to the State in support of its Response to Defendant's first MAR.  JA 228-30.  The draft MAR alleged that McCree had a "wink and nod" deal with the prosecution that was conditioned on his testimony. The MAR further alleged that the prosecution hid evidence of the deal from the defense throughout the trial and initial post-conviction proceedings. Moses also argued that McCree's credibility was a critical issue and that the prosecutor repeatedly vouched for McCree's credibility to the jury. The draft MAR alleged that the State failed to correct false and misleading testimony by McCree.

Also, on September 28, 2009, undersigned counsel Kenneth Rose spoke with Rabil after Rabil had an opportunity to review a draft of the third MAR, along with his July 2009 and his January 2001 affidavits.  JA 229-30, 469-87. Rabil was made aware of the thrust of Petitioner's allegations concerning his failure to reveal the deal before he signed his September 29, 2009 affidavit. During this telephone conversation, Rabil said he wanted to make changes to his July 2009 affidavit. On September 29, 2009, Rose sent Rabil another draft

affidavit, memorializing the changes Rabil wanted to make to his affidavit. JA 229-30. Rabil made one additional change to the draft affidavit, adding only that there was no "written" deal. The critical sentence, however, that McCree would have to trust the State that he would not be charged if he testified, remained unchanged from the April 30, 2009 meeting to the signing of a second affidavit on September 29, 2009.  JA 232.

A series of email communications between Rabil and undersigned counsel confirm that Rabil acknowledged the existence of an undisclosed deal. In these email communications, Rabil gave an accounting of his interaction with McCree at a witness preparation meeting prior to Moses's 1997 trial. Rabil consistently maintained he told McCree to trust him that he would not be prosecuted if he testified against Moses.  Undersigned counsel repeatedly invited Rabil to make changes in the statements and draft affidavits. JA 444, 450, 451, 456.  Rabil did in fact make several changes, but none dealt with the "trust me" deal. *Compare* JA 445, 449 with JA 490, 488. Rabil admitted at the March 2010 evidentiary hearing that he had an opportunity to "say it differently" in the affidavits he signed. JA 269. Over the course of eight months and the reviewing, revising and signing of two separate affidavits, Rabil repeatedly confirmed, under oath, that he told McCree to trust him that he would not be prosecuted if he testified. JA 234.

Rabil also testified he intended to conceal his deal with McCree in order to preserve McCree's trial testimony:

> I didn't want to have to create a problem with [McCree's] credibility that he was saying all this stuff so he wouldn't be prosecuted. I wanted him to testify knowing that, you know, he was incriminating himself and that he might be charged *if someone ever wanted to do that*.

JA 265 (emphasis added).

At the evidentiary hearing, McCree revealed he fully understood the nature of immunity and the negative consequences an immunity deal would have on the State's case against Moses.

> Q. Okay. So Detective Barker said in an affidavit January 29th of 2001 that you came to him and asked him about whether he could get immunity prior to testifying at trial. Is that true?
>
> A. Like I said earlier - - when you asked me about that earlier, I was uninformed of the word immunity when I asked about it. So, therefore, I feel like, you know, when I ask about it, it probably wasn't a good thing to do, you know, being - - using that word now that I know what it is. I was uninformed myself of the word immunity at that time.
>
> Q. Tell me why it wasn't a good thing to do.
>
> A. Because when - - not that I find out what - - It don't mean - - that means something totally other. That's something that you should not have, I mean in certain cases, especially not this one.

22

Q.    Immunity is a bad thing to have?

A.    Yeah, it's bad thing.

Q.    *And the reason it's a bad thing is because if you're asked about it on the stand, you're going to have to tell the jury that you got immunity*?

A.    *Yeah, yeah. . . .*

JA 301-02 (emphasis added). McCree further testified Rabil did not want him asking whether he would be prosecuted if he testified.  JA 293, 309, 310. He knew that Rabil did not want him asking about a deal because he "could see it in [Rabil's] face." JA 309. McCree acknowledged that, at that last witness preparation meeting before Moses's trial, he had asked Rabil for a letter of immunity, and Rabil told him "you're just going to have to trust me." JA 308. When asked how he interpreted Rabil's request to "trust us," McCree stated, "Just have faith, you know, and go through with the trial."  JA 310. *See also* JA 295 (McCree's testimony that Rabil "basically" said, "Go to court, that's what I need you to do").[5]

---

[5] At the evidentiary hearing, Moses offered the testimony of Jim Kendrick, a licensed private investigator, who interviewed McCree on October 22, 2009. During that October 2009 interview, Kendrick showed Rabil's signed September 29, 2009 affidavit, asked McCree to read the signed affidavit, and asked McCree "did he agree or disagree with what was in it."  JA 313.  McCree said he "agreed with [the Rabil affidavit]" which revealed the "trust me" deal between McCree and Rabil.  JA 314.

23

While acknowledging the "trust me" deal at the evidentiary hearing, McCree refuted his 1997 trial testimony that the jury relied upon to convict Moses and sentence him to death. JA 18- 35. McCree's testimony at the evidentiary hearing in this regard lacked credibility and cannot be reconciled with his trial testimony. McCree testified he didn't recall stealing a car from a rental agency. JA 304. McCree testified he did not discuss with Errol Moses "killing Jacinto Dunkley in his house and that you would have to kill anyone who was present with Jacinto Dunkley." JA 305-06. McCree testified he never took the .380 caliber gun into Jacinto Dunkley's house. JA 306-07. McCree testified he never drove Jacinto Dunkley's car after he was murdered. JA 307.

During the evidentiary hearing in state court, Rabil sought to minimize the impact of his testimony regarding the undisclosed deal with McCree. Despite two clear and consistent sworn affidavits, Rabil testified that he "always tried to make it clear to Mr. McCree that he could be charged and there were no deals." JA 248. Rabil also attempted to disavow certain sworn statements in the affidavits he signed prior to the filing of the Third MAR, *see* JA 463, 488 and JA 259-61. Despite Rabil's attempts to distance himself from his own sworn statements, Rabil repeatedly confirmed he had told McCree that he would have to trust him in the context of McCree's request for immunity. *See*, *e.g*., JA 261, 270. Rabil never

24

disclosed to the trial court, trial counsel, Petitioner or the jury his promise to McCree.

This lie remained uncovered through the pendency of Moses's direct appeal, state post-conviction proceedings and federal habeas proceedings. In denying relief, the state court placed a heavier burden on Petitioner than required, finding that the existence of a formal agreement was needed to establish a constitutional violation. In so doing, the state court never addressed the pertinent issue of whether a promise of leniency was implicit in Rabil's counseling to McCree to "trust us" after McCree's request for immunity.

## SUMMARY OF ARGUMENT

Moses's Rule 60 motion should not have been treated by the district court as a successive habeas petition because it focused on fraud on the federal habeas court and because it did not assert claims of error in the movant's state conviction. Further, Moses's Rule 60 motion sets forth an "extraordinary circumstance" justifying relief.

## ARGUMENT

### Request for Certificate of Appealability and Standard of Review

A certificate of appealability under 28 U.S.C. §2253(c) must issue if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). A petitioner satisfies the requirement for a certificate of

appealability by demonstrating that reasonable jurists could debate whether his constitutional rights were denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000) quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983) ("petitioner need not show that he should prevail on the merits ... [r]ather, he must demonstrate that the issues are debatable among jurists of reason"); *see also Miller-El v. Cockrell*, 537 U.S. 322 (2003) ("We look to the District Court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable among jurists of reason").

When a district court has dismissed a petitioner's claim on procedural grounds – as it did here in denying Petitioner's Rule 60(b) motion – the petitioner must demonstrate both "(1) 'that jurists of reason would find it debatable whether the petition [or motion] states a valid claim of denial of a constitutional right' and (2) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Rose v. Lee*, 252 F.3d 676, 684 (4th Cir. 2001) (quoting *Slack*, 529 U.S. at 484); *see also Wade v. Robinson*, 327 F.3d 328, 333-34 (4th Cir. 2003) (Gregory, J., concurring) (setting forth COA burden where procedural matter at issue).

Doubts about whether to grant a certificate of appealability should be resolved in favor of petitioner, *Fuller v. Johnson*, 114 F.3d 491, 495 (5th Cir. 1997), and the Court may consider the fact that the petitioner is under sentence of

26

death in determining whether to grant the certificate. *Porter v. Gramley*, 112 F.3d 1308, 1312 (7th Cir. 1997).  The Court reviews these questions of law *de novo.*

Discussion of Issue

Petitioner's motion under Federal Rule of Civil Procedure 60(b)(6)[6] and (d)[7] was not a successive petition for habeas relief. Instead, Petitioner properly sought relief from the district court's judgment denying him habeas relief in light of the State's fraud on the federal court.

Congress intended to limit the scope of federal habeas review when it passed the Anti-Terrorism and Effective Death Penalty Act (AEDPA) not to eviscerate habeas relief when federal proceedings are defective. *See, e.g., Gonzalez v. Crosby*, 545 U.S. 524, 534 (2005). Hence Rule 60(b) retains "an unquestionably valid role to play in habeas proceedings," *id.*, by ensuring that a federal court can proceed in its "usual manner its impartial task of adjudging cases." *Great Coastal Express, Inc. v. Int'l Bd. Of Teamsters*, 675 F.2d 1349, 1356 (4th Cir. 1982).   The Court in *Gonzalez* characterized a claim involving fraud on the federal court as an example of a defect in the integrity of the federal habeas proceedings that should not be treated as a successive habeas petition. *Gonzalez v.*

---

[6] Rule 60(b) provides: "On motion and just terms, the court may relieve a party … from a final judgment, order, or proceeding for the following reasons: … (6) any other reason that justifies relief."

*Crosby*, 545 U.S. at 532, n.5. The State's attorney Vince Rabil actively committed fraud on the state post-conviction court by submitting an affidavit denying a deal with Casey McCree.  In turn, because a petitioner is required to exhaust issues in state court before raising them in federal habeas proceedings, and because the federal court must consider and defer to state court post-conviction decisions, Rabil's fraud in the state court served as well to perpetuate a fraud in the federal court. Explaining how the AEDPA and Rule 60(b) can coexist without generating frivolous post-judgment motions, the Court in *Gonzalez* emphasized that Rule 60(b) "contains its own limitations," regardless of the procedural context. *Gonzalez*, 545 U.S. at 534-35. For example, motions under 60(b)(6) must demonstrate "extraordinary circumstances," which "rarely occur in the habeas context." *Id.* at 535. In the context of Rule 60(d), where a motion is made for relief from judgment due to "fraud on the court," such claims are to be limited to those egregious forms of subversion of the legal process.

Notwithstanding the broad scope of §2254, Rule 60(b) avoids conflict primarily because its *internal* limitations have always been interpreted strictly. *Id.* In any case, tension between Rule 60(b) and AEDPA dissipates if Respondent, as it did here, acted fraudulently during both state post-conviction litigation and

---

[7] Rule 60(d) provides: "This rule does not limit a court's power to:… set aside a judgment for fraud on the court."

through the completion of federal habeas proceedings. Petitioner's motion implicates the integrity of those prior proceedings, and a motion under Rule 60(b) should not be deemed to be an assertion of a new claim within the meaning of § 2244.

To be sure, the Court in *Gonzalez* explained that a motion under Rule 60(b) that attacks a defect in the state trial does not concern the "integrity of the federal proceedings." *Gonzalez* 545 U.S. at 532. But the assertion of defect in federal habeas proceedings does not fail under *Gonzalez* simply because it implies that an error occurred in the state trial court as well. For example, *Gonzalez* should not be read to mean that relief from judgment is foreclosed when a pattern of deceit begins at trial in state court and culminates with fraudulent nondisclosure during state post-conviction and initial federal habeas proceedings.

Indeed, it would be the height of unfairness that Petitioner who, through no fault of his own, would be punished for not raising a claim in his federal habeas petition that, despite diligent efforts in state court proceedings, could not have been supported by evidence given that the State hid the evidence of the secret deal with its key witness until after the conclusion of the federal habeas proceedings. As the Supreme Court recognized in *Banks v. Dretke*, 540 U.S. 668 (2004), the suppression of evidence by state actors during pendency of the state post-conviction proceedings constitutes "cause" for a petitioner's failure to present

29

such evidence in support of *Brady* claim. The *Banks* Court found that "prosecutors represented at trial and in state postconviction proceedings that the State held nothing back. …  Moreover, in state postconviction court, the State's pleading denied that [the witness] was an informant. It was not incumbent on Banks to prove these representations false; rather, Banks was entitled to treat the prosecutor's submissions as truthful." *Id.* at 698.

In *Banks*, the petitioner was able to raise his *Brady* claim in federal habeas proceedings because some evidence supported the claim at the commencement of federal habeas proceedings. Petitioner here could not have brought a colorable *Napue*[8] and *Giglio*[9] claim in his federal habeas petition, as had been raised in his state post-conviction pleading, as the state actor, despite repeated and diligent efforts by Petitioner, continued to hide the evidence of the deal with McCree and only revealed the underlying evidence of the deal years after the conclusion of the federal habeas proceedings.  It would be an absurd result that the State in this case should benefit where the state actor managed to hide his own malfeasance for a longer period of time than the state actors in *Banks*, namely, through both state post-conviction and federal habeas proceedings.  As the Court stated:

---

[8] *Napue v. Illinois*, 360 U.S. 264 (1959) (violation of due process when prosecutor knowingly presents false testimony and fails to correct such testimony).

> The State … urges, in effect, that the prosecution can lie
> and conceal and the prisoner still has the burden to …
> discover the evidence, so long as the potential existence
> of a prosecutorial misconduct claim might have been
> detected.  A rule thus declaring prosecutor may hide,
> defendant must seek, is not tenable in a system
> constitutionally bound to accord defendants due process
> … Prosecutors' dishonest conduct or unwarranted
> concealment should attract no judicial approbation."

*Banks*, 540 U.S. at 696 (internal quotations and citations omitted).  Under the rare

circumstances of this case, *Banks* supports finding that Rule 60(b) should permit

Petitioner to reopen the tainted federal habeas proceedings due to the misconduct

on the part of the State.

As set out in *In re Genesys Data Technologies, Inc.*, this Court has deemed

fraud on the court that "'seriously' affects the integrity of the normal process of

adjudication" to include "fraud by bribing a judge, or tampering with a jury, or

fraud by an officer of the court, including an attorney."  204 F.3d 124, 130 (4th

Cir. 2000); *see also Great Coastal Express, Inc.*, 675 F.2d at 1357. As an assistant

district attorney at the time of Petitioner's trial in 1997, Petitioner's direct appeal

in 1999, Petitioner's initial state post-conviction proceedings in 2000-2001, and,

at the time Petitioner filed his federal habeas petition in 2003, Rabil clearly

constitutes an officer of the court whose failure to disclose precluded Petitioner

---

[9] *Giglio v. United States*, 405 U.S. 150 (1972) (prosecution's failure to disclose to
jury that witness had been promised that he would not be prosecuted in exchange

from supporting a claim in federal habeas proceedings. *See In re Golf 255, Inc.*, 652 F.3d 806, 809 (7th Cir. 2011) (in deciding "what kind of fraud ought to be a ground for setting aside a judgment," noting that the scope should include "fraudulent submissions by a lawyer for one of the parties in a judicial proceeding, such as tendering documents he knows to be forged or testimony he knows to be perjured"); *compare Workman v. Bell*, 484 F.3d 837, 840 (6th Cir. 2007) (declining to find alleged fraudulent conduct "on the part of an officer of the court" where alleged conduct was that of law enforcement witness and lay eyewitness).

Prosecuting attorney Rabil represented the State in the initial state post-conviction proceeding, and through his deceit, foreclosed the opportunity for Petitioner to raise any claim concerning the promise of leniency in federal habeas proceedings. The State's counsel, acting as an officer of the court, directed conduct that was willfully blind to the truth, that was a positive averment or concealment in derogation of his duty to disclose, and that deceived the courts as to the validity of the underlying prosecution. As a result, the State undermined the integrity of federal habeas proceedings by preventing the courts from considering the defendant's strongest basis for relief. Petitioner's Rule 60 motion does not represent a collateral attack on the underlying criminal conviction; rather, it

---

for testimony violates due process).

exposes a defect in the federal habeas proceedings that began with unethical conduct by the State at trial and persisted throughout the pendency of state post-conviction proceedings.

For these reasons, the Court remains free to exercise its equitable power to grant relief from judgment pursuant to rule 60(b)(6) and (d). When a state prosecutor, who represented the state at trial, during the pendency of direct appeal to the state supreme court, through the litigation of the state post-conviction proceedings, admits to having fraudulently obtained judgment against a capital defendant who has exhausted all state and federal appeals, surely "extraordinary circumstances" and "extreme hardship" exist which call for relief in this rare instance under Rule 60(b). The judgment as it stands is "manifestly unconscionable." *In re Genesys*, 204 F.3d at 130. Moreover, the AEDPA cannot be interpreted in a way that "deprives a federal court of the power to adjudicate the rights of parties." *Gonzalez*, 545 U.S. at 534. Petitioner faces execution without having received the extent of due process guaranteed by our Constitution.

## CONCLUSION

For the foregoing reasons, Petitioner-Appellant respectfully requests this Court to grant him a Certificate of Appealability and remand the case for further proceedings in the United States District Court.

## REQUEST FOR ORAL ARGUMENT

Because of the complexity and importance of the issue presented by this appeal, Petitioner requests oral argument.

This the 3rd day of April 2013.


Kenneth J. Rose
Kenneth J. Rose
N. C. State Bar # 17208
Center for Death Penalty Litigation
201 West Main Street, Suite 301
Durham, North Carolina 27701
(919) 956-9545


/s/Shelagh Rebecca Kenney
Shelagh Rebecca Kenney
N. C. State Bar # 28202
Center for Death Penalty Litigation
201 West Main Street, Suite 301
Durham, North Carolina 27701
(919) 956-9545

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because this brief contains 7,157 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced fourteen point Times New Roman typeface, Microsoft Word software version 2007.

Respectfully submitted this the 3rd day of April 2013.


/s/Shelagh Rebecca Kenney
SHELAGH REBECCA KENNEY

Attorney for Petitioner-Appellant

## **CERTIFICATE OF SERVICE**

In accordance with Rule 25 of the Rules of the United States Court of Appeals for the Fourth Circuit, I hereby certify that I have this April 3rd, 2013, filed the required copies of the foregoing Opening Brief of Appellant in the Office of the Clerk of the Court, via hand delivery and have electronically filed the Opening Brief of Appellant using the Court's CM/ECF system which will send notification of such filing to the following counsel:

Mary Carla Hollis, Assistant Attorney General
NORTH CAROLINA DEPARTMENT OF JUSTICE
Capital Litigation
Federal Habeas Corpus Section
P. O. Box 629
Raleigh, NC 27602-0629
mchollis@ncdoj.gov


April 3rd, 2013

/s/Shelagh Rebecca Kenney
SHELAGH REBECCA KENNEY